ANTHONY J. ATKINSON,

          Plaintiff,

     v.

UA AIRLINES,

          Defendant.

No. 14 CV 10367

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony J. Atkinson alleged that his former employer, UA Airlines, fired him on the basis of his age and race and in retaliation for making a race-discrimination claim. Defendant moved for summary judgment, and during the briefing of this motion, Plaintiff withdrew his age-discrimination claim, leaving only the Title VII discrimination and retaliation charges at issue. *See* 42 U.S.C. §§ 2000e, *et seq*. For the following reasons, defendant's motion is granted.

## I.    Legal Standard

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To determine whether any genuine fact issue exists, a court must assess the proof as presented in the record, including depositions, answers to interrogatories, admissions, and

affidavits, view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor. Fed. R. Civ. P. 56(c); *Scott v. Harris,* 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011). If a claim or defense is factually unsupported, the court should dispose of it at the summary judgment stage. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings but must designate specific material facts showing there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir. 2000).

## II.    Background

Defendant UA Airlines employed Plaintiff Anthony Atkinson from approximately October 28, 1985 to October 6, 2014. Atkinson is African-American.

United maintains an Employee Handbook called the Working Together Guidelines, and Atkinson received a copy. Within the Guidelines, a "Professionalism" policy states in relevant part that employees must "communicate and perform all duties in a safe, courteous, helpful, competent, dependable and businesslike manner[,] act in ways that reflect favorably on the company, yourself and your co-workers[, and] refrain from aggressive or threatening behavior, whether through words or actions." Additionally, the Guidelines contain a Violence-Free Workplace Policy stating in part:

> United Airlines is committed to providing a work environment that is free from acts and/or threats of violence. We recognize that our co-workers face some significant challenges every day when they report to work, but dealing with threats and physical violence should not be one of them. United Airlines will not tolerate any form of violence and/or threat of violence in our workplaces or to co-workers as they perform their work duties. We believe that all co-workers have a basic right to be safe and secure in the workplace. The Company will not tolerate any behavior which endangers the safety of its co-workers or customers.

> Co-workers who violate this policy may be subject to disciplinary action, up to and including discharge. Customers and other non-co-workers are also subject to this policy while on United Airlines' premises or otherwise interacting with United Airlines co-workers during the course of, or as a result of, performing their work duties.

In 2013, Atkinson read and signed the Terminal Lead Minimum Expectations, which state in part that Terminal Leads shall "[l]ead and direct your people setting a good professional example."

Atkinson began his tenure with United as a mechanic in San Francisco and transferred to the same position at Chicago O'Hare International Airport in 2003. In 2012 he became a Lead Line Technician, a promotion that accrued strictly as a result of his seniority. From October 1985 to July of 2011, Atkinson did not receive any discipline for violent or aggressive language or behavior in the workplace, nor was he aware of being investigated for such behavior.

## A.     The Bokowy-Martinez Incident

On July 2, 2011, Atkinson was late for his shift. The lead, Jerry Martinez, assigned another employee, Tom Bokowy, to Atkinson's area and reassigned

Atkinson to a different area once he arrived. Atkinson then called his supervisor, Robert Raizk, to complain. Atkinson asked Raizk, in reference to Martinez, "How do you want me to bring him down, by the throat?" Atkinson does not deny saying this, but clarifies that he was joking. Bokowy complained to Martinez that Atkinson threatened him and told him to "shut the fuck up," which Atkinson does not deny but says was prompted by Bokowy yelling at him and interrupting him.

This incident resulted in Atkinson being held out of service, suspended, losing a week of pay, and receiving a Level 3 discipline, which stated in part: "Anthony on July 2, 2011 you were held out of service after an investigation found you had violated the working together guidelines and the violence-free workplace policy. We found that the remarks you made to your co-workers were threatening and intimidating. . . . Threatening behavior is unacceptable and under no circumstances will physical violence or threatening behavior be tolerated. . . . It is with the violation of these guidelines that we are proposing a Level 3 and asking you to seek the assistance from [the Employee Assistance Program] offered by United Airlines." Garrett West, Senior Manager of Technical Operations, issued Atkinson's Level 3 discipline. West is white and is aware that Atkinson is African-American.

Atkinson did not go to the EAP as requested. On September 19, 2011, after challenging the disciplinary action against him, Atkinson received a response from Employee Compliance Senior Manager Wayne Slaughter, who affirmed that the discipline was justified.

**B.    The Le Pla Incident**

On December 16, 2013, day-shift Lead Line Technician Glenn Le Pla told his shift manager Brian Kummerer that Le Pla and Atkinson had gotten into an altercation in the lead's office. Kummerer collected witness statements from Jerome Bovy, Bob Jensky, Matt Billen, Michael Churas, Doug Adams, Atkinson and Le Pla. All were witnesses to the incident and all but Atkinson are white. Kummerer turned the witness statements over to Linda Ross, Human Resources Manager, who reviewed them. Additionally, Atkinson made a complaint against Le Pla to United's ethics and compliance hotline, which Ross investigated. She personally interviewed all seven witnesses during the course of her investigation.

According to witnesses, during the heated confrontation the men yelled, screamed, cursed, and slammed doors. Atkinson jumped or lunged out of his seat, stood close to Le Pla's face in a threatening manner, and "verbally attacked" Le Pla. Atkinson alleges that Le Pla slammed the door on Atkinson's hand twice, injuring it, but the other witnesses do not corroborate this. Le Pla does admit to slamming the door, but Ross's understanding based on her investigation was that he slammed the door so he could speak privately with Atkinson. Atkinson reported the incident to his foreman and saw a doctor for injuries to his hand. He also provided a typed written statement, which he had someone else sign for him due to his hand injury. West decided not to place either Le Pla or Atkinson out of service at this time.

On December 23, 2013, Atkinson told Ross that he had been assaulted during the Le Pla Incident and was upset that no one had contacted him. That day,

Atkinson met with West and Kummerer, with Ross participating by telephone. During the meeting, Atkinson grew agitated as he explained his side of the story. Atkinson admits to saying in reference to Le Pla, "I'm going to fight him to his death if—if this happens again." However, he denies saying, "People keep pushing me, I'm going to take them out," which both Ross and West recall him saying. Atkinson also denies that West ever asked him to sit down or calm down, though West recalls doing so in response to Atkinson's "very agitated, aggravated, and aggressive" demeanor.

Pursuant to policy, Atkinson received a "close out" letter on February 4, 2014, from Ross in response to his complaint to the ethics and compliance hotline. The letter stated in part, "I was unable to substantiate that an assault occurred; however the facts support that there was an argument and the Day Shift Lead did swing the door open abruptly which may have struck your hand." Ross also noted that Le Pla's behavior was in violation of the Working Together Guidelines and Violence-Free Workplace. The close-out letter did not mention any potential or recommended discipline with respect to Atkinson, since he was the complainant in this particular investigation and discussion of a complainant's infractions would not have been dealt with in a close-out letter.

Nevertheless, Atkinson was not disciplined or verbally counseled on or immediately after December 23. He was not advised that his fight with Le Pla had violated United's policies until he received notice of his pending termination on

April 1, 2014. Ross did recommend to West that Le Pla be disciplined and West provided him with verbal counseling.

### C.     The Rothlisberger Incident

On December 29, 2013, two weeks after the Le Pla Incident, Atkinson encountered Mike Rothlisberger in the doorway of the lead office. Defendant states that Atkinson brushed past Rothlisberger to get into the office without first asking him to move, and made physical contact with Rothlisberger's shoulder as he did so. Rothlisberger became angry and shouted, "Get the fuck off me." Atkinson counters that the only contact he made was tapping Rothlisberger on the shoulder to attempt to move past him.

During its investigation into the Rothlisberger incident, United collected statements from Atkinson, Rothlisberger, and other witnesses. Atkinson and Jesse Peoples are African-American, while the remaining four witnesses are white. In Rothlisberger's statement, he noted, "This is yet another example of [Atkinson's] bullying and intimidation tactics that he employs from time to time in an attempt to provoke anyone he can lure into a confrontation. Again, as I have stated in previous letters, I strongly feel that United Airlines shares responsibility for continuing to allow/enable this behavior that is at the center of the hostile work environment that is constantly present here at Charlie North." Co-worker Mark Simpson had a tense encounter with Atkinson shortly before the Atkinson-Rothlisberger confrontation, and also gave a statement to United. Simpson concluded, "Simply put [Atkinson] is a bully." Jesse Peoples described Atkinson trying to get through the doorway "like

'you mind stepping aside so I can come in,'" and added, "[Atkinson] only put his hands on [Rothlisberger] because he was in the room door way," and "I wouldn't call it hostile it was more stupidity."

West held Atkinson out of service during the investigation of the Rothlisberger incident due in part to Atkinson's accumulation of three incidents in quick succession. The parties dispute whether Atkinson ever received his pay from that period. West testified that he did not hold Rothlisberger out of service because there were no allegations of physical assault or contact against Rothlisberger and because Rothlisberger had not been involved in multiple recent incidents, as Atkinson was. However, Ross recommended that Rothlisberger be disciplined and Kummerer spoke to Rothlisberger about company expectations and the Working Together Guidelines.

Atkinson made another complaint to the ethics and compliance hotline regarding Rothlisberger's conduct. On February 5, 2014, Ross sent Atkinson another close-out letter stating in part, "the investigation revealed that you did not push Mike Rothlisberger," and that Rothlisberger was in violation of the Working Together Guidelines and Violence-Free Workplace policy. Once again, this letter did not comment on Atkinson's behavior since he was the complainant in this ethics investigation. Ross explained in her declaration to this court that the fact that she did not include disciplinary recommendations regarding Atkinson in either the February 4 or February 5 close-out letters did not indicate that his behavior did not warrant discipline.

### D.      Plaintiff's Workplace Complaints

On a series of occasions overlapping with these co-worker incidents, Atkinson lodged complaints of racial discrimination against United. On December 30, 2013, he filed a complaint with Ethics and Compliance alleging that West, Rothlisberger and Bill Zydel racially discriminated against him by placing him out of service pending investigation of the Rothlisberger incident, and that African Americans are placed out of service for incidents that are discounted when white workers are involved. Ross investigated this complaint.

On January 15, 2014, Atkinson complained to Ross that he was being discriminated against on the basis of his race. Ross testified that she discussed this complaint with West after the investigations were closed out and that in the January 15 meeting, Atkinson could not give any details supporting his belief that he was the victim of racial discrimination.

On January 22, 2014, Atkinson filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission. He amended this charge on March 17, 2014, and again on April 22, 2014, to reflect the further disciplinary action against him, including the Last Chance Agreement described below.

### E.      Potential Comparators

Atkinson also made four accusations regarding verbal altercations and curse-filled arguments with white co-workers who he contends were responsible for the altercations and were not disciplined to the degree that Atkinson was. The first of

these involved Le Pla, in the incident described above. The second is a separate incident involving Rothlisberger, who allegedly swore at Atkinson and got in his face, calling him stupid and acting as though he were going to hit him. John Maddox, an African-American co-worker, had to restrain Rothlisberger and tell him, "It's not worth it." Maddox also stated that Atkinson provoked the incident. Atkinson reported this incident to his foreman, who promised to speak to Rothlisberger but later told Atkinson he had forgotten all about it. Atkinson then filed a written complaint and discussed the issue with managers Brian Kummerer and Dave Hostetler as well as a union steward. There is no documentation suggesting the incident was further investigated.

The third incident involved Thomas Bokowy, who allegedly told Atkinson that Martin Luther King and Muhammad Ali were "fakes" and made reference to what he would do to Atkinson with a gun if he were in Atkinson's neighborhood.[*] There is no record of a hotline complaint regarding Bokowy's gun comments, and Atkinson admitted that he didn't report them to West but instead reported only the Martin Luther King and Muhammad Ali comments. Atkinson also complained that Bokowy was sharpening knives in front of him and making threatening facial expressions. TSA later confiscated the knives and Bokowy was moved to another area of the workplace and counseled on the Working Together Guidelines. This was Bokowy's first disciplinary incident. Atkinson called the Ethics hotline on November 22, 2011, to complain that he had been held out service for the Martinez incident

---

[*] This incident occurred in 2011 and is thus time-barred. However, it is relevant evidence of plaintiff's claim of United's practice of discrimination. *Mathewson v. National Automatic Tool Co., Inc.*, 807 F.2d 87, 90 (7th Cir. 1986).

while Bokowy was not held out of service for the knife-sharpening incident. United confirmed that Bokowy had brought knives to work, but could not confirm whether they were used specifically to intimidate Atkinson.

The fourth incident occurred on August 21, 2012, and involved John Del Carlo, who United confirms yelled "fuck you" at Atkinson in a "very loud and aggressive manner." Atkinson did not allege threatening or violent behavior by Del Carlo. In an October 22, 2012 letter to Atkinson, United stated that "corrective action was taken" against Del Carlo but did not elaborate on what that entailed.

Del Carlo, Rothlisberger, Bokowy, and Le Pla were all managed by West at the time of these incidents, were all either Mechanics or Lead Mechanics, and were all subject to the Working Together Guidelines and Violence-Free Workplace Policy, as was Atkinson.

## F. The Last Chance Agreement and Termination

Ross prepared an Investigation Summary Report in which she considered Atkinson's entire disciplinary history and concluded that his behavior was creating "a hostile work environment . . . His crew has advised each other not to be alone with Atkinson; he intimidates, 'He traps you. He gets between you and a door so there's no escape'; and 'gets inches from people's face.'" In mid-January 2014, Ross completed her investigation of the Le Pla and Rothlisberger incidents and embarked on several months of conversations and meetings with West and other leadership, United's legal, HR and Labor departments, Employee Compliance, and the EAP regarding whether to give Atkinson a Last Chance Agreement or terminate his

employment immediately. Ross testified that management ultimately decided to give Atkinson an LCA out of consideration for his long tenure with United.

On April 1, 2014, Atkinson and his union representative attended a meeting where Atkinson was told that his conduct warranted termination but that he could avoid termination by signing the LCA. A letter dated the same day informed Atkinson that "we value your employment at United and hope you will take the necessary steps to continue a long and successful career," and urged him to contact the EAP with any issues. A separate letter on April 1, 2014, laid out of the terms of the LCA, which included a mandatory referral to the EAP and an undated resignation letter to be used by United in the event Atkinson failed to satisfy the terms and conditions of the LCA. The LCA also stated: "You expressly waive all other right to contest, inter alia, the propriety, severity, fairness, or reasonableness of any termination pursuant to this paragraph." Initially, Atkinson signed and dated the LCA but refused to sign the letter of resignation. He and/or his attorney then negotiated over the wording of the resignation letter.

On July 14, 2014, HR re-sent the LCA and a revised letter of resignation to Atkinson. The July 14 letter also referenced a complaint Atkinson had lodged with the Ethics & Compliance office, alleging a conspiracy to frame him with false allegations and stating in part: "THIS COMPANY HAVE [sic] A LOT OF EVIL LURKING WITHIN ITSELF. MY NEW PURPOSE AND JOB IS TO DESTROY THIS EVIL . . . I WILL DESTROYED [sic] THIS LURKING EVIL WITH GODS HELP OF COURSE. YOU PEOPLE HAVE NO BELIEF IN GOD. GOOD LUCK U

WILL NEED IT." The July 14, 2014 letter stated that United considered Atkinson's letter to be a threat in violation of company policy and that similar threats or conduct would result in termination.

After receiving the July 14 letter, Atkinson refused to sign either the re-sent LCA or the revised resignation letter. However, neither Atkinson nor his attorney raised other issues with United regarding either the LCA or the resignation letter.

On October 7, 2014, Atkinson received a letter of termination from United, stating that because he failed to respond to their offer, his employment was terminated.

## III. Discussion

Title VII makes it unlawful for employers to discriminate against employees because of their sex or race. 42 U.S.C. § 2000e, *et seq*. "In order to succeed in a Title VII lawsuit, a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action. . . and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC,* 724 F.3d 990, 995 (7th Cir. 2013) (citing *Coleman v. Donahoe,* 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)). Additionally, Title VII forbids retaliating against an employee because he has opposed any practice made unlawful by the act, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. *Collins v. Am. Red Cross*, 715 F.3d 994, 998 (7th Cir. 2013) (quoting 42 U.S.C. § 2000e–3(a)).

A plaintiff can demonstrate discrimination by proving that he 1) belongs to a protected class, 2) met his employer's legitimate expectations, 3) suffered an adverse employment action, and 4) received disparate treatment from similarly situated employees who were not members of the protected class. But this is just one possible pattern that suggests discrimination. Direct and indirect evidence can and must be considered together. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016). The district courts must consider "the broader question [of] whether 'a reasonable factfinder [could] conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Hudson v. Miramed Revenue Grp.*, 2016 WL 6948374, at *5 (N.D. Ill. 2016) (citing *Ortiz*, 834 F.3d at 765). Under *Ortiz*, "[T]he sole question that matters [is w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had a different ethnicity, and everything else had remained the same . . . all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 764–66.

### A. Plaintiff's Discrimination Claim

A jury could not conclude that, but for his race, Atkinson's employment would not have been terminated. Among the disruptive and aggressive incidents that are catalogued above, there are at least three documented, undisputed instances in which Atkinson voiced threats to his co-workers: the Martinez incident ("How do you want me to bring him down, by the throat?"), the Le Pla incident ("I'm going to fight him to the death if—if this happens again"), and the 2014 ethics & compliance

complaint ("THIS COMPANY HAVE A LOT OF EVIL LURKING WITHIN ITSELF. MY NEW PURPOSE AND JOB IS TO DESTROY THIS EVIL . . . GOOD LUCK U WILL NEED IT.") Although I accept Atkinson's characterization that he was joking with respect to Martinez, Atkinson still had multiple violations of United's Working Together Guidelines and Violence-Free Workplace Policy. The incidents accelerated in the months preceding Atkinson's termination. Moreover, he was given frequent warnings and opportunities to conform to company standards and his behavior did not improve.

Atkinson attempts to offset his own admitted violations of company policy by contrasting his disciplinary history and conduct with that of four white co-workers. "Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) (quoting *Srail v. Village of Lisle,* 588 F.3d 940, 945 (7th Cir. 2009)). "There must be 'enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Id.* at 847 (quoting *Barricks v. Eli Lilly and Co.,* 481 F.3d 556, 560 (7th Cir. 2007)).

First, Atkinson argues that he was unfairly placed out of service after the Le Pla incident while Le Pla was not placed out of service, even though the allegations against Atkinson were merely lunging at Le Pla and verbally attacking him whereas the allegations against Le Pla included slamming Atkinson's finger in the

door. However, Atkinson was not placed out of service immediately; it was only after the December 29 Rothlisberger incident—Plaintiff's third incident in a short period of time—that West decided to take that action against Atkinson. Unlike Le Pla, Atkinson had a disciplinary history (the 2011 Martinez incident) and witnesses corroborated his aggressive behavior, while no witnesses corroborated Atkinson's claim about Le Pla. Although West had not yet interviewed witnesses when he made the decision to hold Atkinson out of service, he had received the report from Kummerer that did not contain any corroboration of Atkinson's claim. Moreover, even Atkinson did not claim that Le Pla intentionally slammed the door on his hand, rendering this allegation less serious than it might seem at first glance. Because the claims against Le Pla were not corroborated and were of a less serious nature, because Le Pla was not involved in three aggressive incidents in a short period of time, and because Le Pla had no documented, prior history of workplace policy violations, he is not similarly situated to Atkinson and thus not a useful comparator.

Next, Atkinson alleges that Rothlisberger was never disciplined after he swore at Atkinson, got in his face, called him stupid, and acted as if he were going to hit him. Yet Atkinson doesn't contend that Rothlisberger had a long or checkered disciplinary history, which United has consistently cited as the reason for its harsher treatment of Atkinson. Additionally, Maddox, an African-American co-worker who witnessed the event, said that Atkinson, not Rothlisberger, started the altercation. By contrast, in the incidents where Atkinson was disciplined, witnesses

corroborated his aggressive behavior and no one besides Atkinson himself argued that he was responding to provocation. Thus, even if United mishandled its investigation of Rothlisberger, his underlying conduct does not serve as a useful comparison to Atkinson's own slew of aggressive behavior.

The third comparator, Bokowy, was in fact disciplined for the knife-sharpening incident. This was his first disciplinary incident. In its investigation, United could not confirm whether the knives were used to specifically intimidate Atkinson but nevertheless, they responded to Atkinson's complaint by counseling Bokowy and moving his workplace. With respect to the allegation that he spoke threateningly of what he would do with a gun if he were in Atkinson's neighborhood, Atkinson himself admits that he did not report this to West, so the company's inaction here is irrelevant. Finally, Bokowy's comments about Martin Luther King and Muhammad Ali being "fakes" were disrespectful and antagonizing, but they were not threatening and as such cannot be put in the same category as the allegations against Atkinson. So although Bokowy was not placed out of service, his threatening conduct did not repeat over time. He is not similarly situated to Atkinson.

The fourth and final comparator is Del Carlo, who angrily and loudly yelled "fuck you" at Atkinson. This incident is less severe than the Atkinson incidents and therefore not an instructive comparator. Moreover, Del Carlo did receive corrective action and it was his first incident.

Atkinson argues that the reason these four white co-workers have lighter disciplinary histories than he does is precisely because United punishes African-American employees more harshly for similar infractions. While this is theoretically possible, in this case the argument does not stand up to scrutiny. As discussed above, Atkinson does not offer any evidence that these comparators engaged in frequent threats and severe misconduct for which they were not punished or punished more leniently. Rather, they committed a variety of infractions, many of which were less serious than Atkinson's infractions, and some of which triggered disciplinary action. And none of the four comparators had as many alleged incidents in as short a time as Atkinson. On this record, no inference of intentional discrimination can be drawn because there is no pattern of treating similar, repeated acts of hostility by white employees more favorably than Atkinson was treated.

Finally, it is undisputed that West testified that throughout his entire tenure at United, he was unaware of any other employee with three aggressive or threatening incidents within a short time period. In this context, United has provided a valid, race-neutral explanation for Atkinson's firing. The burden thus shifts to Atkinson to prove that this explanation is a pretext.

To show pretext, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (citing *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir.

2011)). Atkinson has offered no evidence to suggest that United did not honestly believe that his disciplinary infractions merited discharge. On the contrary, United appears to have extended Atkinson many opportunities to correct his behavior and retain his job, which he declined to do.

For these reasons, no jury could find that but for his race, Atkinson would not have been discharged. Defendant's motion for summary judgment on Count I is granted.

### B.    Plaintiff's Retaliation Claim

Plaintiff's retaliation claim consists of two parts. First, he contends that the timing of the termination is suspicious because it was set into motion on April 1, 2014, just a few months after Plaintiff's January 22, 2014 EEOC charge. Furthermore, Atkinson received a close-out letter to the Rothlisberger investigation on February 5, 2014, which found that 1) he did not push Rothlisberger, 2) Rothlisberger was in violation of the Violence-Free Workplace Policy and Working Together Guidelines, and 3) Atkinson "would be made whole for being suspended without pay pending the investigation." Atkinson argues that the sequence of events suggests retaliation, since nothing changed between United's conciliatory letter on February 5 and the introduction of the LCA on April 1, other than his EEOC charge. But the February 5 letter was a close-out letter to an investigation of a complaint against Rothlisberger—any disciplinary decisions made with regard to Atkinson would have been dealt with separately. In fact, Ross and other managers

were still in the process of discussing what to do about Atkinson when the February 5 close-out letter was sent.

"[M]ere temporal proximity between the statutorily protected activity and the action alleged to have been taken in retaliation for that activity will rarely be sufficient in and of itself to create a triable issue." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (alterations omitted). Other than timing, there is nothing in this record that would allow a reasonable jury to infer that the EEOC charge was a factor in Atkinson's termination. Instead, Ross's, West's, and the other decision-makers' written reports and testimony only discuss taking disciplinary action as a result of Atkinson's escalating aggressive behavior and repeated violations of workplace policies. Although Atkinson filed his EEOC charge not long before United issued the LCA, there is simply no evidence of a causal link between Atkinson's protected activity and United's decision to terminate his employment.

The second piece of Atkinson's retaliation claim is his argument that the terms of the LCA were facially retaliatory. The LCA required Plaintiff to "expressly waive all other right to contest, inter alia, the propriety, severity, fairness, or reasonableness of any termination pursuant to this paragraph," which Atkinson interprets to mean that he was being asked to waive his right to file a Title VII discrimination claim, among other things. In this reading, the LCA sets up a Hobson's choice for Plaintiff—he must sign away his Title VII rights or be fired. The Seventh Circuit has hinted that such a threat "would be a form of anticipatory

retaliation, actionable as retaliation under Title VII." *Beckel v. Wal–Mart Assoc., Inc.*, 301 F.3d 621, 624 (7th Cir. 2002).

However, the hypothesis in *Beckel* involved an employer who "threatened the plaintiff with firing her if she sued," a scenario with a clear causal link between the protected activity and the retaliatory action. *Id*. That is not the case here. United never framed the possibility of termination as a threatened consequence for Atkinson's failure to sign the LCA. (In fact, Atkinson did initially sign the LCA.) Rather, both the decision-makers' testimony and the LCA itself cited Atkinson's violation of workplace policies as the triggering events that led to termination. Indeed, there is no material dispute that it was Atkinson's workplace behavior that set off the chain of events resulting in termination. Thus, there is simply no evidence that but for Atkinson's unwillingness to waive his Title VII rights, he would not have been terminated. In addition to *Beckel*, Atkinson relies on *E.E.O.C. v. Cognis Corp.*, 2011 WL 6149819 (C.D. Ill. 2011). The plaintiff in *Cognis* received an LCA that included an explicit requirement that he waive his Title VII rights. Citing *Beckel*, the court found that although the language of 42 U.S.C. § 2000e–3(a) does not explicitly prohibit threats of retaliation, "Cognis's threat of retaliation contained in the LCAs constitutes a retaliatory policy under Title VII." *Id*. at *9. This was particularly true because the Title VII waiver was unlikely to actually encourage the plaintiff to improve his work performance; rather, it "simply had the effect of protecting [the employer] from statutorily protected activity of its employees for the duration of the LCA, a goal which cannot be achieved legally." *Id*.

There are notable differences between *Cognis* and the case at bar. Unlike in *Cognis*, Atkinson and his counsel never raised the waiver issue when negotiating other terms, nor did he ask anyone at United whether his interpretation of that paragraph was correct. Indeed, it was the resignation letter and not the LCA that he originally refused to sign. The negotiations here were over Atkinson's disciplinary infractions and his willingness to correct that behavior going forward. Neither side contends that the waiver entered into these calculations, nor do they materially dispute that Atkinson's disciplinary history was the cause of his termination.

United's LCA may have been broader than enforceable. It is certainly broader than the term that was found unenforceable in *Cognis*, which only required that plaintiff to waive his Title VII rights, not "*all other right* to contest, *inter alia*, the propriety, severity, fairness, or reasonableness of any termination pursuant to this paragraph." (Emphasis added). But without evidence that Atkinson's termination was caused by his failure to execute this waiver, a jury could not conclude that this language constituted anticipatory retaliation as contemplated in *Beckel*.

Defendant's motion for summary judgment on Count II is granted.

## IV.    Conclusion

Defendant's motion for summary judgment is granted. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  1/4/2017